IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JAMES W. WHITE,<br>    Plaintiff,<br><br>v.<br><br>HITACHI, LTD., HITACHI GLOBAL STORAGE<br>TECHNOLOGIES, INC., and HITACHI GLOBAL<br>STORAGE TECHNOLOGIES NETHERLANDS B.V.,<br>    Defendants. | No. 3:04-CV-20<br>(Phillips) |

## MEMORANDUM AND ORDER

This is a patent infringement case. Plaintiff James W. White is the named inventor of a hard disk drive slider design. White alleges that the Hitachi defendants have infringed upon United States Patent No. 4,870,519 (the "519 patent" or the "patent-in-suit") which was issued to White on September 26, 1989.

The Hitachi defendants have moved for summary judgment on the grounds that they are validly licensed to practice the patent-in-suit pursuant to a license that was entered into between IBM and White, effective October 20, 2000, which was assigned to Mariana HDD B.V., now HGST B.V. by IBM; and that HGST Inc., is validly sublicensed by HGST B.V.

White has filed a cross-motion for summary judgment on the grounds that the Hitachi defendants are not validly licensed to practice the patent-in-suit.

## Factual Background

White is a retired professor of mechanical engineering whose speciality is fluid dynamics – particularly air flows over components within a hard disk drive. White invented an improved slider, which allows hard disk drives to perform more reliably with less lost data, fewer corrupted files, and fewer computer crashes. In 1989, the U.S. Patent Office awarded White patent '519 for his improved slider. Since then, White has licensed 22 companies to practice the '519 patent, including IBM.

In November 2000, IBM and White entered into the IBM-White License Agreement. The terms were favorable to IBM because of the special relationship between White and IBM and the assistance IBM provided White in his education. The key terms of the agreement were prepared by White's counsel and stated that IBM and White had agreed upon the following items: (1) that four of White's U.S. issued patents (including the '519 patent at issue here) would be licensed to IBM, and the license would be for the life of the patents; (2) that IBM would also be licensed under any additional patents that were filed and owned by White two years before the execution of the license agreement; (3) a payment schedule for the lump sum payment of $6.5 million by IBM to White; and (4) that "additional terms and conditions will be the subject of a license agreement between the parties." Pursuant to the agreement, IBM received a fully paid-up royalty-free license to all of White's patents, with the right to sublicense its subsidiaries in exchange for a payment to White of $6.5 million, paid in installments. IBM paid the first $5 million during 2000-2002,

and the final installment of $1.5 million was paid by HGST B.V., on or about August 15, 2003. The license continues until the last of the White patents expires.

For the purposes of this litigation and motion, the key provision of the IBM-White license is in Section 5, entitled "Assignments," which provides:

> 5.1 All releases and licenses from White to IBM shall not be assignable or otherwise transferable, except to a successor of IBM's business to which this Agreement relates, provided such successor is either already licensed under the patents licensed hereunder, or has no previous business relating to the Licensed Patents.

Pursuant to paragraph 5.1 of the agreement, IBM was entitled to assign the IBM-White license to any company that acquired its hard disk drive business, provided either that the successor was already licensed under the licensed patents, or the successor had no previous business relating to the licensed patents.

Between 2000 to 2002, IBM decided to focus on software and services instead of computer hardware. Accordingly, IBM decided to exit the hard disk drive business. In early 2002, IBM struck a deal to sell its hard disk drive business to Hitachi, Ltd. In April 2002, Hitachi, Ltd. and IBM entered a memorandum of understanding in which the parties envisioned forming a subsidiary to receive IBM's hard disk drive assets. IBM would contribute its hard disk drive business to a joint venture entity which would be owned 70% by Hitachi, Ltd. and 30% by IBM. Hitachi, Ltd. would hold 100% of the voting power, and IBM would not participate in the management of the joint venture entity.

-3-

Case 3:04-cv-00020   Document 179   Filed 09/17/07   Page 3 of 17

In July 2002, IBM created a subsidiary called Mariana HDD B.V. Mariana was created pursuant to the agreement between IBM and Hitachi, Ltd. relating to the proposed transfer of IBM's worldwide hard disk drive business to a new entity to be jointly owned by Hitachi and IBM. Mariana was incorporated on July 24, 2002 in the Netherlands as a wholly-owned subsidiary of IBM.

On November 1, 2002, IBM sublicensed to Mariana its rights under all of its third-party patent licenses, including its rights under the IBM-White license, and made to Mariana a contribution in kind of all of IBM's tangible and intangible assets and liabilities of its hard disk drive business located in the United States in exchange for stock in Mariana. Prior to the transfer of IBM's business to Mariana, Mariana was not in the hard disk drive business. By December 31, 2002, through a series of transactions involving various IBM foreign subsidiaries, IBM transferred all of its overseas hard disk drive businesses to Mariana as well. On December 27, 2002, after IBM had transferred its United States hard disk drive assets and liabilities to Mariana, and after it had sublicensed Mariana under the IBM-White license, IBM assigned the IBM-White license to Mariana.

After all of the remaining intangible and tangible assets and liabilities of IBM's worldwide hard disk drive business had been transferred to Mariana, Hitachi acquired 70% of the stock in Mariana, making Hitachi the controlling shareholder of Mariana. Thereafter, Mariana's name was changed to Hitachi Global Storage Technologies Netherlands B.V. (HGST B.V.). HGST B.V. does not itself make hard disk drives, but owns the stock of

research, development, manufacturing, and sales subsidiaries around the world that make and sell hard disk drives. One of those subsidiaries is defendant Hitachi Global Storage Technologies, Inc., (HGST Inc.). After December 31, 2002, HGST B.V. transferred to HGST Inc. (the U.S. subsidiary of HGST B.V.) the intangible and tangible assets and liabilities that were formerly IBM's hard disk drive business in the United States.

On April 1, 2003, approximately three months after the IBM-White license had been assigned to Mariana, renamed HGST B.V., Hitachi made to HGST B.V. a contribution in kind of all of Hitachi's tangible and intangible assets and liabilities of its hard disk drive business in exchange for 1,840 class B shares of HGST B.V. The contribution of Hitachi's hard disk drive business represented a small fraction of the business owned by HGST B.V., the rest of which had previously come from IBM. Hitachi's overall equity interest in HGST B.V. increased from approximately 70% to approximately 74% following this contribution of assets to the company.

In a series of letters beginning about two months after Hitachi purchased a controlling interest in Mariana and changed its name to HGST B.V., HGST Inc. and IBM both notified White's counsel that IBM had assigned the IBM-White licence to Mariana; that Hitachi had purchased a controlling interest in Mariana and changed its name to HGST B.V.; and that HGST B.V., as the assignee, would be making the final payment due under the IBM-White license. On March 4, 2003, IBM wrote to White, informing him that IBM had assigned the IBM-White license to Mariana and that Mariana was the successor to IBM's

-5-

hard drive disk business, was licensed at the time of the assignment, and had no previous business relating to the licensed patents prior to IBM's contribution of its hard disk drive business to Mariana. On March 21, 2003, White's counsel wrote to HGST B.V. requesting documentation to verify that HGST B.V. was licensed under the IBM-White license. Thereafter, HGSt B.V. informed Robert Tassinari at IBM of White's letter to HGST B.V.

Sometime in mid-June 2003, Tassinari spoke to White's counsel about the fact that IBM had assigned the IBM-White license to Mariana/ HGST B.V. On July 1, 2003, Tassinari sent to White's counsel documents demonstrating that on November 1, 2002, IBM had granted a sublicense to Mariana under the IBM-White license, that on December 27, 2002, IBM had assigned the IBM-White license to Mariana, and that Mariana was the successor to IBM's hard disk drive business.

A final $1.5 million installment payment was due under the IBM-White license in August 2003. On July 22, 2003, White contacted Tassinari at IBM by letter regarding the payment. Tassinari responded by letter on August 7, 2003, reiterating that IBM had assigned the IBM-White license to Mariana, which had been renamed HGST B.V., and that White should expect to receive the August 2003 payment from HGST B.V. On August 15, 2003, HGST B.V. informed White's counsel that the IBM-White license had been assigned and that HGST B.V., as the assignee, would be making the final payment. White, through counsel, received the $1.5 million payment from HGST B.V., while simultaneously denying

-6-

Case 3:04-cv-00020   Document 179   Filed 09/17/07   Page 6 of 17

that the license had been validly assigned. White filed the instant complaint in January 2004. This matter is before the court on the parties' cross-motions for summary judgment.

**Analysis**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A license is a complete defense to a claim of infringement. *Schering Corp. v. Roussel-UCLAF SA,* 104 F.3d 341, 347 (Fed.Cir. 1997) (defendant enjoyed complete defense against patent infringement claim because it held a valid license); *McCoy v.*

*Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir. 1995) (A license is an affirmative defense to a claim of patent infringement).

Based upon the record and applicable law, the court finds that IBM validly assigned the IBM-White license agreement to Mariana, later renamed HGST B.V. under the plain meaning of paragraph 5.1 of the agreement. Paragraph 5.1 expressly permits assignment to an entity that is "a successor of IBM's business to which this Agreement relates" provided the entity was "either already licensed under the patents licensed hereunder, or has no previous business relating to the Licensed Patents." As of December 27, 2002, the day that IBM assigned the IBM-White license to Mariana, Mariana owned all of the U.S. assets and liabilities previously owned by IBM related to its hard disk drive business, making it a "successor" of IBM's business. Further, Mariana was sublicensed by IBM under the IBM-White licence making it "already licensed" under the license. Moreover, prior to becoming a successor to IBM's hard disk drive business, Mariana was not previously in the hard disk drive business. Mariana, as successor to IBM's hard disk drive business, needed only to be "previously licensed," or in the alternative, to have had "no previous business relating to the Licensed Patents" in order to be validly assigned the IBM-White license. If Mariana met either condition listed in Section 5.1, the assignment was valid. Here, Mariana met both of these conditions. Thus, the assignment of the IBM-White license by IBM to Mariana on December 27, 2002 complied with the plain meaning of the assignment provision of the IBM-White license.

White does not contest the fact that IBM clearly had the right to move its hard disk drive business into a subsidiary and assign the license to that subsidiary; however, White asserts that this particular assignment is invalid because Mariana became a Hitachi, Ltd subsidiary when Hitachi, Ltd. purchased a controlling interest in Mariana (and Hitachi, Ltd. was previously in the hard disk drive business but not previously licensed).

A sale of stock does not result in the violation of a contract provision prohibiting assignment absent express language prohibiting a change of control, because a license or other contract does not transfer from one corporation to another when the stock of the corporation is sold. *See Institut Pasteur and Pasteur Sanofi Diagnostics v. Cambridge Biotech Corp., 104 F.3d (1ˢᵗ Cir. 1997*) (sale of debtor's stock to appellant's major competitor in Chapter 11 bankruptcy proceedings did not violate the non-assignment clause of a patent license, because the corporation holding the license is a legal entity distinct from its shareholders, and the license remained with that corporation when stock was sold); *Baxter Pharm. Prods. Inc. v. ESI Lederlie Inc.,1999 De.Ch. LEXIS* 47 (De.Chancery, March 11, 1999) (stock purchase agreement was not an assignment within the meaning of the assignment clause of agreement, because the company that exists and holds the contract after the stock transfer is the same company that existed and held the contract before the stock transfer); *Baxter Healthcare Corp. v. Concepts, Inc.,* 69 F.3d 785 (7ᵗʰ Cir. 1995) (distinguishing between sale of stock and mergers with respect to violations of an anti-assignment clause, holding that sales of stock do not constitute assignments); *Branmar Theater Co. v. Branmar, Inc., 264 A.2d 526 (De.*Chancery, March 24, 1970) (stock

-9-

sale did not constitute assignment of lease in violation of anti-assignment clause); *Review Directories, Inc. v. McLeodusu Publ Co.,* 2001 U.S.Dist. LEXIS 9807 (W.D.Mich., July 9, 2001) (sale of stock did not violate anti-assignment clause of trademark license because holding otherwise would be improperly piercing the corporate veil).

In the case of a stock sale, the licensee remains the same corporation and only the ownership of that corporation changes. Therefore, any agreements held by that corporation continue to be held by the same corporation, they are not assigned to another corporation. *See Institut Pasteur,* 104 F.3d at 494 (stock sale did not violate the non-assignment clause of a patent license because the corporation holding the license is a legal entity distinct from its shareholders and the license remained with that same corporation when the stock was sold); *Baxter Pharm.,* 1999 De.Ch. LEXIS 47 (stock sale did not constitute assignment within the meaning of the assignment clause because the company holding the agreement before and after the stock transfer was the same company).

HGST B.V. is the same corporation as Mariana, with only a name change that has no effect on its legal status or rights. When Hitachi, Ltd purchased a controlling interest in the stock of Mariana, only the stock ownership of Mariana changed. No new corporation was formed. The IBM-White license was never assigned again after the initial assignment from IBM to Mariana; therefore, the stock sale presents no basis for invalidating the initial assignment or for otherwise terminating the license. Similarly, although Hitachi changed Mariana's name to HGST B.V. when it purchased the controlling

-10-

interest in Mariana, a name change does not affect an assignment or present a basis for invalidating the license.

The cases relied on by White in which a stock sale was held to be a prohibited assignment of a contract are inapposite to this litigation. Those cases involved situations in which a particular contract was the only asset of the corporation whose stock had been sold, making the stock sale effectively nothing more than a transfer of the ownership of that one agreement. *See In Re Alltech Plastics, Inc.,* 1987 Bankr. LEXIS 2259 (W.D.Tenn., Dec. 30, 1987) (sale of stock considered a prohibited assignment under the license agreement where company whose stock was sold was a defunct company with no assets other than the license); *Westinghouse Electric & Mfg. Co. v. Radio-Craft Co., Inc.,* 291 F. 169 (D.N.J. 1923) (stock sale held to violate nontransfer provision of license where original licensee was an abandoned business that was absorbed by the purchaser with the license being the only real asset transferred). That is not the situation here, which involved a sale of stock in a company with over $2 billion worth of other assets beyond the IBM-White license.

Hitachi, Ltd purchased stock of Mariana, a business comprising the world's second-largest hard disk drive business with facilities all over the world, facilities previously owned and operated by IBM, and approximately 18,000 employees. These facilities and their employees have not been absorbed into Hitachi's plants and offices. Hitachi purchased the stock of an actively operating business, with assets which exceed $2 billion,

-11-

Case 3:04-cv-00020   Document 179   Filed 09/17/07   Page 11 of 17

while the value of the IBM-White license was only $6.5 million.  The sale of Mariana stock to Hitachi could not be described as merely the transfer of the IBM-White license as White contends.

White next argues that HGST's license depends on reading the words "or otherwise transferable" out of paragraph 5.1 of the license.  HGST acknowledges that the license is neither assignable nor otherwise transferable except to a successor of IBM's hard disk drive business who was either already licensed or not previously in the hard disk drive business.  White's interpretation of the language of paragraph 5.1 ignores these two exceptions.  As noted by White in his memorandum of law, "All parts of the agreement must be given effect; no parts may be ignored or deleted from the agreement."  Cal.Civ. Code § 1641; *Boghos v. Certain Underwriters at Lloyd's of London,* 36 Cal. 4th 747, 757 (Cal. 2005).  Mariana met both of the alternative criteria of paragraph 5.1 for a valid assignment. There is no factual dispute that Mariana is a "successor" and that it was not previously in the hard disk drive business; nor is there any dispute that Mariana was sublicensed to practice the White patents prior to being assigned the license by IBM.

Further, the IBM-White license contains no provision either equating a change of control with an assignment or terminating the license upon a change of control.  Courts will not imply a provision equating a stock sale with an assignment or a provision terminating a license upon a change of control where none exists in the agreement.  *See Institut Pasteur,* 104 F.3d 489 (rejecting licensor's argument that sale of licensee's stock

to licensor's competitor was still "in substance" an assignment of the licenses, finding that licensor could have, but did not, include a change of control provision in the licenses); *Baxter Pharm.,* 1999 De.Ch. LEXIS 47 (holding that stock purchase agreement was not an assignment of rights and a delegation of the duties within meaning on nonassignability clause of agreement because agreement did not equate "assignment" with "stock acquisition," or otherwise explicitly prohibit stock acquisitions); *Branmar Theater Co.,* 264 A.2d 526 (stock sale did not constitute assignment of lease in violation of anti-assignment clause because lessor should have included, but did not include, a provision providing for termination upon sale of stock); *Transamerica Commercial Finance Corp. v. Borg-Warner Corp.,*1990 WL 186088 (N.D.Ill., Nov. 8, 1990) (licensor did not bargain for the right to prohibit such stock sales without its consent. If licensor wanted that right, it could have so provided in its form contract); *PPG Indus. Inc. v. Guardian Indus. Corp.,* 597 F.2d 1090 (6th Cir. 1979) (where a license contains no change of control provision, a mere change in the ownership of the licensee's stock will not nullify the licenses). As the court in *Institut Pasteur* explained:

> [The licensor] was free to negotiate restrictions on [the licensee's] continuing rights under the [licenses] based on changes in its stock ownership or corporate control. Nevertheless, these [licenses] contain no provision either limiting or terminating [the licensee's] rights in the event its stock ownership were to change hands. The generic nonassignability provisions found in these [licenses], plainly do not address the circumstance present here.

*Institut Pasteur,* 104 F.3d at 494. White had the opportunity to negotiate restrictions, including termination of the license, based upon a change of control, but he did not. The IBM-White license requires that it be construed in accordance with California law. The

-13-

Supreme Court of California has recognized that a stock sale does not terminate a license unless the license agreement specifically provides that it does. *See Farmland Irrigation Co., Inc., v. Dopplmaier,* 48 Cal.2d 208 (Cal. S.Ct. 1957). In *Farmland*, the court explained:

> The contract was made, however, with a corporation, and a corporation by nature may change both in ownership and the agents through whom it acts. If William H. Stout had simply sold his stock in the corporation, defendant could surely not contend that the corporation's rights under the license would be extinguished. Since Manseur dealt with a corporation, if he thought that control of the corporation by a particular person was essential to assure an advantageous return of royalties, he would have provided against the possibility of that person's selling his interest. Manseur's failure to do so is a strong indication that he did not consider personal control by William H. Stout essential.

*Id.* at 223. Moreover, California law favors the assignability of all contracts, including patent licenses. *Id.* (finding that state law governs the assignability of patent licenses and California law favors assignability of all property rights under contracts, including patent licenses); *see also, Superbrace, Inc., v. Tidwell*, 124 Cal.App. 388 (Cal.App. 4th Dist. 2004).

In the IBM transaction, White was represented by experienced licensing counsel who drafted the agreement. Moreover, White acknowledged at his deposition that in 2000, when the IBM-white license was executed, he was aware of the concept that an agreement could have provisions that change a party's rights upon a change of control of that company. Yet neither White nor his lawyer included such a provision in the IBM-White agreement. The IBM-White license, as executed and as assigned to Mariana, contained no language stating that a "change of control" of Mariana would terminate the patent license. The court will not imply such a restriction now.

White repeatedly asserts that the assets of IBM's hard disk drive business were transferred to Hitachi, Ltd, but that assertion is not true. In fact, the assets were transferred to Mariana/HGST B.V. and are still owned by HGST B.V. and its subsidiaries and were never transferred to Hitachi, Ltd. Alternatively, White argues that the license transferred as a matter of law from IBM to Hitachi, Ltd. when Hitachi bought Mariana/HGST B.V. stock. However, HGST B.V., not Hitachi, Ltd was assigned and transferred the IBM-White license. That license was never transferred to Hitachi, Ltd and Hitachi does not claim to be licensed. White's arguments ignore the most fundamental characteristic of a corporate entity – its independence.

For White's argument that Hitachi is a "successor" to IBM's hard disk drive business to prevail, White would have to show that Hitachi, and not Mariana/HGST B.V. is the assignee of the IBM-White license. White has failed to identify any document that purports to transfer the license from Mariana/HGST B.V. to Hitachi, Ltd, and he has failed to cite any legal authority that supports a holding that the stock sale effected such a transfer as a matter of law.

It appears that White is asking the court to name HGST B.V. as Hitachi's alter ego and then pierce the corporate veil. To succeed, White must show that the corporate form was abused to circumvent public policy or to subvert justice. *See Chrylser Corp. v. Ford Motor Co.,* 972 F.Supp. 1097, 1107 (E.D.Mich. 1997). To determine whether the Hitachi defendants abused the corporate form in this way, the court looks to the motives

of the involved entities.  White, however, has not alleged facts that would allow the court to pierce the corporate veil of HGST B.V. and his argument that HGST is Hitachi's alter ego fails.

Last, White argues that if the creation of HGST B.V. is viewed as a merger under Section 5.1, then a transfer of the IBM-White license was improper.  This argument is also without merit.  Mergers and stock sales are distinctly different from one another.  A merger is "the absorption of one company by another, the latter retaining its own name and identity and acquiring the assets, liabilities, franchises, and powers of the former, and the absorbed company ceasing to exist as a separate business entity."  *See* Black's Law Dictionary (5th ed. 1979).  Thus, in a merger, the assets of the absorbed corporation, including any licenses it held, transfer to the absorbing corporation.

In a stock sale, by contrast, the ownership of a corporation changes with the sale of the stock, but the corporation remains the same corporate entity as before the stock sale.  *Baxter,* 69 F.3d at 791.  Thus, the assets, including any licenses held by the corporation, do not transfer to anyone but remain with that corporation.  *Id.*; *see also PPG Indus.* 597 F.2d at 1096.  Here, IBM created a subsidiary, Mariana, into which IBM contributed its hard disk drive business, Hitachi then purchased a controlling stock interest in that company, and, months later, contributed its hard disk drive business assets to the company in exchange for additional stock.  The transaction involved a stock sale, not a merger, and the IBM-White license therefore never transferred to Hitachi.

## Conclusion

Because there are no disputed issues of material fact and because the terms of the IBM-White license, applicable law, and principles of equity all support the validity of the assignment of the IBM-White license by IBM to Mariana/HGST B.V., which then validly sublicensed HGST, Inc., the Hitachi defendants are entitled to summary judgment that they have not infringed the '519 patent and that HGST B.V. and HGST, Inc. are licensed to practice the '519 patent. Accordingly, defendants' motion for summary judgment [Doc. 118] is **GRANTED**, and plaintiff's cross motion for summary judgment [Doc. 130] is **DENIED.**

The parties are **DIRECTED** to file a report on the status of the PTO's review of the '519 patent by **October 15, 2007.**

**ENTER:**

    s/ Thomas W. Phillips
    United States District Judge